Filed 10/11/24  P. v. Wilson CA2/4

NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(a). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115(a).

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| THE PEOPLE, | B326783 |
| Plaintiff and Respondent, | Los Angeles County |
| v. | Super. Ct. No. BA464321 |
| JOHMAR WILSON, | |
| Defendant and Appellant. | |

APPEAL from an order of the Superior Court of Los Angeles County, Drew E. Edwards, Judge. Reversed in part, affirmed in all other respects.

Nancy J. King, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Senior Assistant Attorney General, David E. Madeo and Viet H. Nguyen Deputy Attorneys General, for Plaintiff and Respondent.

## INTRODUCTION

A jury convicted defendant and appellant Johmar Wilson of murder, attempted murder, shooting at an occupied motor vehicle, and being a felon in possession of a firearm. The incident that gave rise to these convictions involved Wilson's participation in a retaliatory shooting of a rival gang member (Jermaine Williams), who died as a result of his wounds, and the rival gang member's girlfriend (Jade Elliston), who survived. On appeal, Wilson argues (1) the trial court erroneously instructed the jury on a kill zone theory of attempted murder; (2) several of his convictions are unsupported by substantial evidence; and (3) the court erroneously admitted gang-related evidence. Because we agree the trial court erred by instructing the jury on a kill zone theory, we reverse Wilson's attempted murder conviction. We affirm the judgment in all other respects.

## PROCEDURAL BACKGROUND

The Los Angeles County District Attorney filed an amended information charging Wilson with the murder of Jermaine Williams (Pen. Code,[1] § 187; count one); the attempted murder of Jade Elliston (§§ 664/187, subd. (a); count two); shooting at an occupied motor vehicle (§ 246; count three); and being a felon in possession of a firearm (§ 29800, subd. (a)(1); count four). The amended information further alleged Wilson committed the murder and attempted murder willfully, deliberately, and with premeditation. (§ 189, subd. (a); § 664, subd. (a).) The jury convicted Wilson on all counts and allegations. The trial court sentenced Wilson to 32 years to life plus 8 months in state prison.

---

1    All further undesignated statutory references are to the Penal Code unless otherwise specified.

2

The sentence consisted of a term of 25 years to life on count 1; 7 years to life on count 2; and 8 months on count 4. The trial court stayed sentencing on count three under section 654.

Wilson timely appealed.

## FACTUAL BACKGROUND

The parties are familiar with the facts underlying Wilson's convictions, so we need not recount them in great detail. (*People v. Garcia* (2002) 97 Cal.App.4th 847, 851 [unpublished opinion merely reviewing correctness of trial court's decision "does not merit extensive factual or legal statement"].) We instead provide the following summary.

**Prosecution evidence**

Wilson was a member of a gang known as the Fruit Town Brims (Brims). Kenneth Durden was Wilson's "big homie" (i.e., mentor) in the gang. On February 23, 2016, Durden was killed at Harvard Park, a stronghold for the Brims gang. Wilson later told police he was present when Durden was killed.

A memorial for Durden was held at his grandmother's house two days after his death. Wilson attended the gathering and became emotional.  Someone named "Baby Nut" called one of the men at the memorial service to go to a Buffalo Wild Wings restaurant located on South Crenshaw Avenue. That evening, Wilson received a message on social media, warning Wilson: "[D]on't get caught up in no emotions about [Durden] and hop in one of them cars and get caught up. Please don't. It ain't what we do . . . . You got too much of a bright future ahead of you, homie. Think first." Wilson replied, "I respect that." These messages were apparently in reference to a plan to kill Jermaine Williams, a member of the Neighborhood 40s Rollin Crips, in retaliation for

Durden's death. Wilson apparently ignored the advice contained in the messages, and instead went with several men to the restaurant. Montel Egans was part of the group. Wilson knew Egans had a gun. Wilson drove his white Infiniti to the Buffalo Wild Wings. Williams was at the restaurant with his girlfriend, Jade Elliston.

Wilson entered the restaurant and was inside for less than 15 minutes. Although he later told police he entered the restaurant to have a drink and talk with some women, surveillance video footage from the restaurant did not show him order anything to drink or socialize with any women.[2] The video showed Williams walk past Wilson, but the two men did not interact.

Video footage showed Williams drove away in his BMW with Elliston. Wilson's Infiniti followed, but the occupants are not visible in the video. Ernest Reyes, who was part of Wilson's group, also followed Wilson and Williams in a white truck. There was no video footage of the actual shooting. Wilson later told police that Egans, who was seated in the back seat of Wilson's car, fired a gun at Williams's car.

Concepcion Rivera was driving near where the shooting occurred. She heard a "pop," then a black BMW hit her Honda Accord. Frank Ware was also driving close to where the shooting occurred. He saw seven gunshots fired from the Infiniti, and he went to the BMW to help the victims as the Infiniti drove away. Ware found Williams unconscious behind the steering wheel. He had suffered multiple gunshot wounds and his breathing was

---

2      The prosecution's theory at trial was Wilson entered the restaurant to confirm Williams was inside so the group could prepare to attack him once he left.

labored. Elliston, seated in the passenger seat, was screaming. Police arrived at the scene less than 10 minutes later. Williams suffered four gunshot wounds, including one fatal wound to his back. Elliston suffered two gunshot wounds but survived.

Police recovered ten .40 caliber bullet casings at the scene. The BMW had multiple bullet impacts on it, including on the driver's side door frame, the hood, one of the front headlights, and the windshield. All of the bullet impacts were on the driver's side of the car.

Police were later informed that a person who drove a white sports utility vehicle that was seen in surveillance footage captured at the time of Durden's murder was a member of the Brims who had a gang moniker containing an "S." Because Wilson's moniker was "Baby Stretch," he became a person of interest. Police then discovered Wilson had purchased a white Infiniti FX35 in November 2015. Cell phone records placed Wilson's phone in the vicinity of the Buffalo Wild Wings shortly before the shooting and in the vicinity of the shooting while it occurred. Records also showed Egans's cell phone was at the murder scene.

Police arrested Wilson and placed him in a jail cell with Egans. Wilson told Egans, "They got my car." Egans replied the police were "faking" it or trying to scare Wilson. Egans wanted Wilson to be quiet.

The police interviewed Wilson twice. During his first interview, Wilson admitted he had been at Harvard Park when Durden was killed, though he claimed the killing was not gang-related and denied owning or driving a car that day. When shown a picture of the white Infiniti, Wilson claimed he had never seen or been inside the car. When confronted with records showing the

car had been registered in his name, Wilson insisted he was not allowed to own a car because of his driving record, and could not explain documents showing he had purchased the car. When confronted with evidence that his cell phone was near the Buffalo Wild Wings around the time of the murder, Wilson again had no explanation.

After the first interview, Wilson's girlfriend Angelina Green told police that Wilson owned the white Infiniti. Police showed Wilson video footage of Green's statements and interviewed him a second time. Wilson then admitted he had owned the white Infiniti. He said he got rid of the car because it was involved in a murder on Western Avenue.[3] Wilson continued to deny that he went to Buffalo Wild Wings. Wilson instead claimed that Egans used Wilson's car to go to the store while Wilson's cell phone was in the car.

Wilson eventually admitted he drove his Infiniti to the Buffalo Wild Wings. He claimed that he grabbed a drink and chatted with some women inside the restaurant. He also claimed that, when the shooting occurred, he was in Reyes's white truck because he knew Egans was armed. Wilson said he saw Egans fire a gun from the back seat of his car. Wilson claimed he did not know why Egans committed the shooting.

The prosecution called gang experts, one of whom testified the Buffalo Wild Wings was in territory claimed by Black P-Stone, a gang that was friendly with the Brims (Wilson's gang). The Brims are a rival gang of the Neighborhood 40's Rollin Crips (Williams's gang). The expert also testified that if a gang member is harmed by a rival gang member, there would be an expectation that the harmed gang member's gang would retaliate.

---

3      Williams was murdered on Western Avenue.

**Defense evidence**

Dr. Robin Campbell evaluated Wilson and opined that he suffered from post-traumatic stress disorder and mild intellectual disability.

## DISCUSSION

### I. Wilson's attempted murder conviction is reversed because the trial court prejudicially erred in instructing the jury on a kill zone theory of liability

Wilson argues his attempted murder conviction must be reversed because the trial court prejudicially erred in instructing the jury on a kill zone theory of liability. For the reasons discussed below, we agree.

#### A. Background

At the close of evidence, Wilson moved to dismiss the attempted murder charge, arguing there was no evidence showing Wilson targeted Ellison or intended to kill everyone in the car. The trial court disagreed, concluding that, broadly speaking, the kill zone theory of attempted murder liability should apply in situations like this, when two victims are shot while sitting close together in a car.

On the attempted murder count, using an outdated version of CALCRIM No. 600, the trial court instructed the jury, in relevant part, as follows:

> A person may intend to kill a specific victim or victims and at the same time intend to kill everyone in a particular zone of harm or "kill zone." In order to convict [Wilson] of the attempted murder of Jade Elliston on concurrent-intent theory, the People must prove that [Wilson] not only intended to kill Jermaine

7

Williams but also either intended to kill Jade Elliston, or intended to kill everyone within the kill zone. If you have a reasonable doubt whether [Wilson] intended to kill Jade Elliston or intended to kill Jermaine Williams by killing everyone in the kill zone, then you must find [Wilson] not guilty of the attempted murder of Jade Elliston.

As discussed in greater detail below, after our Supreme Court in *People v. Canizales* (2019) 7 Cal.5th 591 (*Canizales*) clarified the legal parameters surrounding the kill zone theory of attempted murder liability, the Judicial Council revised CALCRIM No. 600 to more closely conform with *Canizales*.

### B. Applicable legal principles

"To prove the crime of attempted murder, the prosecution must establish 'the specific intent to kill and the commission of a direct but ineffectual act toward accomplishing the intended killing.' [Citation.] When a single act is charged as an attempt on the lives of two or more persons, the intent to kill element must be examined independently as to each alleged attempted murder victim; an intent to kill cannot be 'transferred' from one attempted murder victim to another under the transferred intent doctrine." (*Canizales*, *supra*, 7 Cal.5th at p. 602.) "[T]he defendant must intend to kill the alleged victim, not someone else . . . . Someone who intends to kill only one person and attempts unsuccessfully to do so, is guilty of the attempted murder of the intended victim, but not of others." (*People v. Bland* (2002) 28 Cal.4th 313, 328 (*Bland*).)

While a defendant's intent to kill may not be transferred among victims, it may exist as to several victims simultaneously. This is called concurrent intent. The kill zone theory relates to

8

concurrent intent. (*Canizales*, *supra*, 7 Cal.5th at p. 603.) Under that theory, the nature and scope of an attack directed at a primary or targeted victim "may raise an inference that the defendant "'intended to ensure harm to the primary victim by harming everyone in that victim's vicinity.'"'" (*Id.* at p. 602.) It has long been clear that such an inference is appropriate in situations where a defendant uses an extreme amount of force to accomplish his or her goal of killing the primary victim. The classic examples are placing a bomb on a commercial aircraft on which the primary target is a passenger, or attacking a group containing the primary target with "'automatic weapon fire or an explosive device devastating enough to kill everyone in the group.'" (*Bland*, *supra*, 28 Cal.4th at p. 330.) Because the outer bounds of the doctrine remained undefined for some years, there was "potential for the misapplication of the kill zone theory" to cases where the inference was not proper. (*Canizales*, *supra*, 7 Cal.5th at p. 606.)

In *Canizales*, the Supreme Court clarified—and limited—the circumstances under which a prosecutor may use the kill zone theory. It held the kill zone theory "may properly be applied only when a jury concludes: (1) the circumstances of the defendant's attack on a primary target, including the type and extent of force the defendant used, are such that the only reasonable inference is that the defendant intended to create a zone of fatal harm—that is, an area in which the defendant intended to kill everyone present to ensure the primary target's death—around the primary target[;] and (2) the alleged attempted murder victim who was not the primary target was located within that zone of harm." (*Canizales*, *supra*, 7 Cal.5th at p. 607.) Under this standard, the kill zone theory is not applicable where "'the defendant merely subjected persons near the primary target to

9

lethal risk'"; conscious disregard of persons proximate to the intended target is insufficient to support application of the theory. (*Ibid.*) In an appropriate kill zone case, "'the defendant has a primary target and reasons [that] he cannot miss that intended target if he kills everyone in the area in which the target is located. In the absence of such evidence, the kill zone instruction should not be given.'" (*Ibid.*) Factors relevant to the defendant's intent to create a kill zone and the scope of such a zone include "the circumstances of the offense, such as the type of weapon used, the number of shots fired (where a firearm is used), the distance between the defendant and the alleged victims, and the proximity of the alleged victims to the primary target." (*Ibid.*) *Canizales* cautioned that "there will be relatively few cases in which the theory will be applicable and an instruction appropriate." (*Id.* at p. 608.)

### C. Analysis

We agree with Wilson that his conviction for the attempted murder of Jade Elliston must be reversed in light of *Canizales*. As *Canizales* cautioned, "trial courts must be extremely careful in determining when to permit the jury to rely upon the kill zone theory." (*Canizales*, *supra*, 7 Cal.5th at p. 597.) "As past cases reveal, there is a substantial potential that the kill zone theory may be improperly applied, for instance, where a defendant acts with the intent to kill a primary target but with only conscious disregard of the risk that others may be seriously injured or killed." (*Ibid.*) "Accordingly, . . . trial courts should reserve the kill zone theory for instances in which there is sufficient evidence from which the jury could find that the *only* reasonable inference is that the defendant intended to kill (not merely to endanger or

harm) everyone in the zone of fatal harm." (*Ibid.*, italics in original.)

Applying these principles, we conclude the trial court erred by instructing the jury on the kill zone theory. The evidence at trial showed Egans fired 10 bullets, and the bullets mainly hit Williams's side of the car. Four bullets hit Williams and two hit Elliston. Williams's car had multiple bullet impacts on it, including on the driver's side door frame, the hood, one of the front headlights, and the windshield. All the bullet impacts were on Williams's side of the car, not Elliston's. It is not clear, on these facts, that "there is sufficient evidence from which the jury could find that the *only* reasonable inference is that the defendant intended to kill (not merely to endanger or harm) everyone in the zone of fatal harm." (*Canizalez*, *supra*, 7 Cal.5th at p. 597, italics in original.) In other words, although one reasonable inference is that Wilson (and Egans) intended to kill everyone in the zone of fatal harm, another reasonable inference is Wilson (and Egans) acted with the intent to kill Williams but with only conscious disregard that Ellison may have been seriously injured or killed. (*Ibid.*) On this record, therefore, we conclude the trial court erred by instructing the jury on the kill zone theory. (*Ibid.*)

We also conclude the error was prejudicial. According to *Canizales*, the applicable inquiry is whether "there is a "'reasonable likelihood'" that the jury understood the kill zone theory in a legally impermissible manner." (*Canizales*, *supra*, 7 Cal.5th at p. 613.) In making this determination, the reviewing court considers "the instructions provided to the jury and counsel's argument to the jury." (*Ibid.*)

11

We agree with Wilson that the kill zone instruction provided here was incomplete. It omitted language, which has since been added to CALCRIM No. 600 in light of *Canizales*, explaining "the People must prove that (1) the only reasonable conclusion from the defendant's use of lethal force, is that the defendant intended to create a kill zone [around a primary target]; and (2) [the alleged attempted-murder victim] was located within the kill zone." (See CALCRIM No. 600.) It also omitted a list of circumstances, which has since been added to CALCRIM No. 600, that jurors should consider "[i]n determining whether the defendant intended to create a 'kill zone' and the scope of such a zone[.]" (*Ibid.*) The instructions given here were deficient in a manner similar to the instructions the Supreme Court found deficient in *Canizales*—they did not adequately define the term kill zone nor properly direct the jury to consider certain relevant evidence regarding the circumstances of the attack. (See *Canizales*, *supra*, 7 Cal.5th at p. 613.) Although the prosecution's closing argument did not compound the error, because the instructions given did not fully define the legal lens through which the jury was required to analyze the facts presented, we conclude "there is a reasonable likelihood that the jury understood the kill zone instruction in a legally impermissible manner." (*Id.* at p. 614.) The trial court thus prejudicially erred by instructing the jury on the kill zone using an incomplete and outdated version of CALCRIM No. 600.[4]

---

4    Although *Canizales* states the applicable prejudice standard is whether it is reasonably probable the jury understood the kill zone instruction in a legally impermissible manner, the parties both assert, albeit for different reasons, that the applicable prejudice standard is whether the use of the outdated

12

For the reasons discussed above, we reject the Attorney General's argument that the trial court correctly instructed the jury using the incomplete and outdated version of CALCRIM No. 600. Additionally, because the erroneous kill zone instruction affected Wilson's substantial rights, we reject the Attorney General's argument that Wilson's instructional error argument should be forfeited on appeal because trial counsel did not object to the use of the outdated version of CALCRIM No. 600. (§ 1259; *People v. Tran* (2018) 20 Cal.App.5th 561, 565, fn. 2.)

## II. Wilson's murder and firearm possession convictions are supported by substantial evidence

Wilson argues his murder and firearm possession convictions are unsupported by substantial evidence. For the reasons discussed below, we disagree.[5]

### A. Substantial evidence review

In assessing Wilson's argument, we review the record in the light most favorable to the judgment to determine if there is substantial evidence from which any rational trier of fact could find each element of the crime beyond a reasonable doubt.

_____

version of CALCRIM No. 600 was harmless beyond a reasonable doubt. We need not decide which prejudice standard applies here, because we conclude the error was prejudicial under both standards.

5      Wilson also argues his attempted murder conviction is unsupported by substantial evidence. Because, as explained above, we reverse Wilson attempted murder conviction based on instructional error concerning the kill zone, we need not address whether his attempted murder conviction is supported by substantial evidence.

(*Jackson v. Virginia* (1979) 443 U.S. 307, 318-319; *People v. Staten* (2000) 24 Cal.4th 434, 460.) Substantial evidence is evidence that is "'reasonable in nature, credible, and of solid value.'" (*People v. Johnson* (1980) 26 Cal.3d 557, 576.) Substantial evidence includes circumstantial evidence and reasonable inferences based on that evidence. (*In re James D.* (1981) 116 Cal.App.3d 810, 813.) In reviewing a sufficiency claim, we "presume in support of the judgment the existence of every fact that the trier of fact could reasonably deduce from the evidence." (*People v. Medina* (2009) 46 Cal.4th 913, 919.) In conducting this analysis, we do not substitute our own evaluation of witness credibility for that of the trial court. (*People v. Ochoa* (1993) 6 Cal.4th 1199, 1206.) "Because we must draw all inferences in support of the judgment, [a] defendant 'bears an enormous burden' when challenging the sufficiency of the evidence." (*People v. Vasco* (2005) 131 Cal.App.4th 137, 161.)

### B. Substantial evidence supports Wilson's murder conviction

Wilson first argues his murder conviction is unsupported by substantial evidence. Specifically, he argues no reasonable juror could have found beyond a reasonable doubt he knew Egans intended to kill Williams, nor could any reasonable juror find he had the specific intent to aid and abet the murder. We are unpersuaded.

Aiders and abettors can only be convicted of first degree murder under a direct aiding and abetting theory. (*People v. Chiu* (2014) 59 Cal.4th 155, 166-167 (*Chiu*), superseded by statute in part as stated in *People v. Gentile* (2020) 10 Cal.5th 830.) First degree murder is the unlawful killing of a human being with malice aforethought along with the additional elements of

14

willfulness, premeditation, and deliberation. (*Chiu*, *supra*, at p. 166.) In order to convict a defendant of first degree murder as a direct aider and abettor, "the prosecution must show that the defendant aided or encouraged the commission of the murder with knowledge of the unlawful purpose of the perpetrator and with the intent or purpose of committing, encouraging, or facilitating its commission." (*Id.* at p. 167.) In other words, a direct aider and abettor to first degree murder must aid or encourage the direct perpetrator in the commission of the murder and act with his or her own willfulness, premeditation, and deliberation. (*Ibid.*)

Applying these principles to this case, the jury could reasonably convict Wilson of directly aiding and abetting Williams's murder. The record reasonably demonstrates Wilson actively participated with his cohorts in a willful, deliberate, and premeditated plan to kill Williams, apparently in retaliation for Durden's murder.

The record shows Wilson was upset about Durden's murder. It also shows that, on the evening when Williams was killed, Wilson received a message on social media from a fellow gang member, warning Wilson: "[D]on't get caught up in no emotions about [Durden] and hop in one of them cars and get caught up. Please don't. It ain't what we do . . . . You got too much of a bright future ahead of you, homie. Think first." A jury could reasonably conclude the message referred to a plan to kill Williams.

An employee of Buffalo Wild Wings called Wilson's cohorts and told them to come to the restaurant. Three cars arrived there: Wilson's Infiniti, a white pickup truck, and a Nissan Maxima. Egans never went into the restaurant and instead

waited outside. As noted above, Wilson told police he went inside the Buffalo Wild Wings, though he said it was to have a drink and talk with some women. The video footage from the restaurant showed Wilson in the restaurant alone; it did not show him order anything to drink or socialize with any women.[6]

Video footage also showed Wilson and his cohorts waited for Williams to leave Buffalo Wild Wings then immediately followed him. Reyes followed Williams in a white truck. When the shooting happened, Egans was seated in the back seat of Wilson's car. Egans hung out the window and fired a gun into Williams's car. Wilson's initial story to the police was that he did not own the Infiniti, and he was not present for the shooting. He later admitted he did own the Infiniti, but claimed Egans had borrowed it to go to the store while Wilson's cell phone was in the car. Wilson acknowledged his car was used in the murder. He eventually admitted leaving Buffalo Wild Wings with Egans and witnessing the shooting, but asserted he was a passenger in Reyes's truck. Wilson claimed he did not want to be in the same car as Egans because he knew Egans was armed. Wilson said he saw Egans fire from the back seat of Wilson's car. The jury could reasonably conclude Wilson's statements were not credible, and that Wilson was in fact driving his car when the shooting took place.

In light of the evidence showing this was a coordinated retaliatory gang murder, that Wilson actively participated in it

---

6    Although Wilson argues in his reply that it is possible he ordered a drink and spoke with women in the restaurant but the surveillance cameras did not capture this, the jury could reasonably conclude Wilson was untruthful and entered the restaurant to confirm Williams was there so the group could carry out its plan to later shoot him.

by confirming Williams was in the restaurant, and that Williams drove Egans to commit the shooting,[7] a reasonable jury could find Wilson guilty of aiding and abetting first degree murder. (See, e.g., *People v. Anderson* (1968) 70 Cal.2d 15, 26-27 [facts about what the defendant did prior to the killing, motive for the killing, and manner in which the killing was carried out may properly sustain a finding of premeditation and deliberation]; *People v. Nguyen* (2015) 61 Cal.4th 1015, 1055-1056 [jury could reasonably infer that defendant in gang shooting knew of shooter's intent, shared that intent, and aided the shooter by spotting potential targets]; *People v. Mejia* (2012) 211 Cal.App.4th 586, 634 ["one who knows another wants to kill, intends to facilitate that killing, and by action does so facilitate, necessarily intends to kill as well"].)

### C. Substantial evidence supports Wilson's possession of a firearm by a felon conviction

Nor are we persuaded by Wilson's argument that his firearm possession conviction is unsupported by substantial evidence. As discussed above, the jury could reasonably conclude, based on the evidence presented at trial, that Wilson drove Egans to commit the shooting with knowledge that Egans had the gun. The jury could thus reasonably conclude that Wilson, while in his car with Egans, had joint dominion and control over the gun. (See, e.g., *People v Williams* (2009) 170 Cal.App.4th 587, 625 ["Possession may be physical or constructive, and more than one person may possess the same contraband. [Citation.] 'Conviction

---

7    The prosecution, during closing argument, argued Wilson was guilty of aiding and abetting first degree murder, either in his role staking out Williams inside the restaurant, in his role driving Egans to commit the shooting, or in both of those roles.

is not precluded . . . if the defendant's right to exercise dominion and control over the place where the contraband was located is shared with another'"]; *People v. Newman* (1971) 5 Cal.3d 48, 53, disapproved on another ground in *People v. Daniels* (1975) 14 Cal.3d 857, 862 [circumstantial evidence may reasonably support a possession finding when contraband is found in a place immediately accessible to defendant and subject to his joint dominion and control with another defendant]; *People v. Miranda* (2011) 192 Cal.App.4th 398, 410-411 [circumstantial evidence reasonably supported the jury's finding that the defendant had joint dominion and control over a shotgun before it was thrown out of a car in which he was a passenger].)

## III. The trial court did not abuse its discretion by admitting gang evidence

Wilson lastly argues the trial court prejudicially abused its discretion by admitting gang evidence that was irrelevant and unduly prejudicial. The Attorney General counters the trial court's admission of the gang evidence was not arbitrary nor irrational, as the evidence was highly probative of Wilson's motive and intent to aid and abet the shooting. We agree with the Attorney General.

### A. Background

In a motion in limine, defense counsel objected to the admission of gang-related evidence. The prosecution responded the gang evidence was relevant to show Wilson's motive for participating in the murder of Williams in retaliation for Durden's death. Defense counsel countered the evidence was inadmissible character evidence. In ruling to admit the evidence, the trial court explained:

18

I have heard from both counsel in this case. I am sure all counsel is aware gang evidence is highly charged. There is the danger of prejudice [to Wilson] if gang evidence is allowed in this case. The court has to look at a two[-]step process.

First, pursuant to [Evidence Code, section 1101, subdivision (b)], whether or not there is a motive and whether or not any of the factors involved would allow gang evidence to come in, [the prosecutor] says the People's theory of the case is the motive is that Mr. Wilson was a member of one gang and there was a murder from another gang, and . . . the alleged victim in this case was a member of the rival gang . . . .

Motive is one of the exceptions that should come in under [section] 1101(b) . . . .

The second step is under Evidence [Code, section] 352, weighing whether or not the evidence that should be brought in would be more prejudicial to Mr. Wilson than probative. In light of the fact the People's theory [of the case is] this is a gang payback, while there is some prejudice to Mr. Wilson, the probative value does outweigh the prejudice to Mr. Wilson.

Over the objection of the defense and based on the offer of proof of [the prosecutor] as to what type of gang evidence will be elicited during the case in chief, the gang evidence will come in in this case.

### B. Applicable Law

Under Evidence Code section 352, trial courts have the discretion to exclude relevant evidence "if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury." Evidence Code section 352 guards against the admission of "evidence which uniquely tends to evoke an emotional bias against defendant as an individual and which has very little effect on the issues." (*People v. Rucker* (2005) 126 Cal.App.4th 1107, 1119.)

We review for abuse of discretion a trial court's determination that evidence is admissible under Evidence Code section 352. (*People v. Doolin* (2009) 45 Cal.4th 390, 437.) "Under the abuse of discretion standard, 'a trial court's ruling will not be disturbed, and reversal of the judgment is not required, unless the trial court exercised its discretion in an arbitrary, capricious, or patently absurd manner that resulted in a manifest miscarriage of justice.'" (*People v. Hovarter* (2008) 44 Cal.4th 983, 1004 (*Hovarter*).)

"'[E]vidence of gang membership is often relevant to, and admissible regarding, the charged offense. Evidence of the defendant's gang affiliation—including evidence of the gang's territory, membership, signs, symbols, beliefs and practices, criminal enterprises, rivalries, and the like—can help prove identity, motive, modus operandi, specific intent, means of applying force or fear, or other issues pertinent to guilt of the charged crime.'" (*People v. Ramirez* (2022) 13 Cal.5th 997, 1095 (*Ramirez*).) "Such evidence is admissible even when a gang enhancement is not charged, provided the probative value of the

evidence is not substantially outweighed by its prejudicial effect." (*Ibid*.) "Gang evidence is relevant and admissible when the very reason for the underlying crime, that is the motive, is gang related." (*People v. Samaniego* (2009) 172 Cal.App.4th 1148, 1167.)

### C. Analysis

We conclude the trial court's admission of gang evidence was not an abuse of discretion. As the trial court correctly explained, the gang evidence was highly probative of Wilson's motive for participating in the shooting. The gang evidence was also highly probative on the question whether Wilson intended to aid and abet the murder of Williams. (*Ramirez*, *supra*, 13 Cal.5th at p. 1095 [gang evidence may be properly admitted to prove motive and intent].) It is true that gang evidence is inherently prejudicial. (See, e.g., *People v. Williams* (1997) 16 Cal.4th 153, 193 ["We have recognized that admission of evidence of a criminal defendant's gang membership creates a risk the jury will improperly infer the defendant has a criminal disposition and is therefore guilty of the offense charged"].) But here, because the gang evidence was highly relevant on the issues of motive and intent, it was not arbitrary nor irrational for the trial court to conclude it was admissible under Evidence Code section 352. (See *Hovarter*, *supra*, 44 Cal.4th at p. 1004; *Ramirez*, *supra*, 13 Cal.5th at p. 1095.)

Because the gang evidence was properly admitted, we reject Wilson's assertion that it violated his right to a fair trial under the Fourteenth Amendment. Additionally, we reject Wilson's suggestion that remand is warranted because no gang allegations were charged in this case. (*Ramirez*, *supra*, 13 Cal.5th at p. 1095 ["[Gang] evidence is admissible even when a gang

enhancement is not charged, provided the probative value of the evidence is not substantially outweighed by its prejudicial effect"].)

## DISPOSITION

Wilson's attempted murder conviction is vacated. In all other respects, the judgment is affirmed.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

CURREY, P. J.

We concur:

MORI, J.

ZUKIN, J.